N. H. NEWMAN, et al.,
Plaintiffs-Appellees,

United States of America, et al.,
Amicus Curiae,

v.

STATE OF ALABAMA, et al.,
Defendants-Appellees,

Charles A. Graddick, Attorney General, State of Alabama, Movant-Appellant.

N. H. NEWMAN, et al.,
Plaintiffs-Appellees,

United States of America, et al.,
Amicus Curiae,

v.

STATE OF ALABAMA, et al.,
Defendants-Appellants.

Nos. 81–7606, 81–8003.

United States Court of Appeals,
Eleventh Circuit.

Aug. 9, 1982.

Charles A. Graddick, Atty. Gen., pro se, Rosa G. Hamlett and John R. Lockett, Asst. Attys. Gen., Montgomery, Ala., for State of Ala.

Ralph I. Knowles, Jr., Tuscaloosa, Ala., M. R. Nachman, Jr., Montgomery, Ala., Jack Drake, University, Ala., for Governor James.

Robert D. Segal, John L. Carroll, Montgomery, Ala. (court-appointed), for Pugh.

John C. Bell, U. S. Atty., Montgomery, Ala., for Bennett.

Philip H. Butler, Montgomery, Ala. (court-appointed), for Newman.

Alvin L. Bronstein, Washington, D. C., for Nat. Prison Projects/American Civ. Liberties Union.

Edwin A. Strickland, Birmingham, Ala., for Gloor, Doss and Edreich.

W. Scears Barnes, Alexander City, Ala., for Ala. Bd. of Corrections.

Before MORGAN, TJOFLAT and KRAVITCH, Circuit Judges.

TJOFLAT, Circuit Judge:

On July 15 and December 14, 1981, the district court ordered officials of the Alabama Department of Corrections to release from custody several hundred convicted state prisoners as a means of reducing unconstitutional overcrowding in the Alabama prison system. In these consolidated cases,

those officials, the Attorney General of Alabama, and the Governor of Alabama, as receiver of the Alabama prison system, challenge the propriety of the district court's orders. Because the appellants have fully complied with the July 15 order, we dismiss the appeal of that order as moot. As for the December 14 order, we conclude that the record does not support its entry. We therefore vacate that order and remand this case to the district court for further proceedings.

## I.

We recite only so much of the eleven year history of this litigation as is necessary to our decision. Beginning in 1971, the plaintiffs, all of whom are Alabama prison inmates, brought three separate lawsuits to redress alleged constitutional violations in the Alabama prisons. *See Newman v. Alabama*, 349 F.Supp. 278 (M.D.Ala.1972); *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala. 1976); *James v. Wallace*, 406 F.Supp. 318 (M.D.Ala.1976).[1] On more than one occasion the district court held that the conditions in the Alabama prison system, including overcrowding, violated the rights of inmates under the eighth and fourteenth amendments and ordered injunctive relief.[2] The court's actions in these cases were affirmed, with modifications, on consolidated appeal. *Newman v. Alabama*, 559 F.2d 283

(5th Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978).[3] In 1979, in an effort to expedite compliance with its orders, the district court appointed Alabama Governor Fob James receiver of the Alabama prison system, charged with bringing the system into conformity with the court's decrees. *Newman v. Alabama*, 466 F.Supp. 628 (M.D.Ala.1979).

On October 9, 1980, the district court approved and signed a consent decree in which the defendants and the receiver (collectively, "the State") agreed to comply fully with all prior remedial orders of the court within specific deadlines. In the portion of the consent decree relevant to this appeal, the court directed the State to reduce periodically the number of state prisoners held in county jails until September 1, 1981, when none were to remain.[4]

Rather than steadily decreasing as the consent decree required, the population of state inmates in county jails actually increased throughout the early months of 1981. The plaintiffs took no steps, however, to obtain compliance with the consent decree; they did not move the district court to order the State to show cause why it should not be held in civil contempt for violating the decree. Instead, they filed a "Motion to Require the Provision of Sufficient Funds for Compliance With the October 9, 1980, [Consent] Order or the Release

1. The defendants in these suits included the State of Alabama, the Department of Corrections, and numerous state officials in their individual and official capacities. In *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978), the Supreme Court held that the eleventh amendment barred this action against the State of Alabama and the Alabama Department of Corrections. The individual state officials who run the various state agencies involved in this case are still parties, however. In this appeal, we deal only with those defendants who are officials of the Department of Corrections, and the Attorney General.

2. This relief included wide-ranging measures to ensure reasonably adequate food, clothing, shelter, sanitation, medical attention, and personal safety for prisoners. *Newman v. Alabama*, 559 F.2d 283, 288 (5th Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d

1160 (1978). This appeal concerns only the issue of unconstitutional overcrowding in the prison system.

3. Thereafter, the three cases were consolidated for further proceedings in the district court.

4. An earlier order of the district court had placed limits on inmate population in state prisons. The State complied in part with this order by crowding state inmates into county jails, where the district court found conditions "worse than any that exist in the state prisons." *Newman v. Alabama*, 466 F.Supp. 628, 630 (M.D.Ala.1979). Thus, it became necessary for the district court to concern itself with the unconstitutional overcrowding of state inmates in county jails.

of Members of the Plaintiff Class Until There is Compliance." This motion asked the court to direct the State to provide funds sufficient to build new prison facilities that would alleviate the overcrowding in county jails. Alternatively, the motion requested the release from state custody of 200 prisoners a week until no state prisoners remained in county jails.

The district court held a hearing on the plaintiffs' motion at which the parties stipulated that the overcrowding of state prisoners in county jails had not abated. The plaintiffs abandoned their request for prison construction funds [5] and asked the court for immediate relief from the overcrowding. On May 20, the court ordered the Department of Corrections to submit to the court a list of 250 prisoners "least deserving of further incarceration"; additional lists, each with the names of 250 prisoners, were to be submitted every two weeks, for a period of eight weeks.

In an order dated July 15, 1981, the district court stated that it had given the defendants "every possible opportunity . . . to achieve compliance with . . . Orders of this Court within the last nine years," yet the State had been "continuously in direct violation of the Orders of this Court." [6] The court concluded that it had "a duty to protect the constitutional rights" of Alabama prison inmates and that "the only valid substantial relief available . . . is the release of a substantial number of inmates to help relieve the overcrowded condition of the Alabama Prison System." The court named 400 inmates to be released,[7] and ordered that on July 24, writs of habeas corpus issue for these prisoners;[8] it also accelerated the parole eligibility dates of fifty others.[9] On July 22, the court amended its July 15 order by reducing the number of inmates to be released on habeas corpus to 277.[10] On July 25, the State complied with the habeas writs and released the designated prisoners.[11]

Despite the July 25 release of 277 prisoners, the plaintiffs remained dissatisfied with

5. The record on appeal does not contain the transcript of this hearing. Subsequent orders of the district court, however, indicate that plaintiffs did not pursue their request that the court order the State to provide sufficient funds for new prison construction.

6. We note that, despite the district court's observation that the State had been in continuous violation of the court's orders, the plaintiffs had never initiated contempt proceedings against the State, the State had never been given the opportunity to show that it was not in contempt, and the court had never adjudged the State in contempt.

7. Although the court had previously ordered the Department of Corrections to submit lists of inmates "least deserving of further incarceration," it was the district court that actually selected the prisoners to be released. The court did not disclose the criteria it used to select these inmates though there is some indication in the record that it attempted to select those who were within six months of their probable parole dates.

8. The use of the writ of habeas corpus to effect the release of prisoners was plainly erroneous since no prisoner had applied for a habeas writ and since the constitutionality neither of prisoners' convictions nor of their sentences was at issue. We therefore treat the district court's

July 15 order as an injunction mandating the release of prisoners not because of any infirmity in the judgments requiring their individual confinements, but in order to remedy unconstitutional overcrowding. Notably, the court's December 14, 1981, release order did not mention habeas corpus.

9. The district court did not actually order that these inmates be released; rather, it directed the Board of Pardons and Paroles to accelerate consideration of their release on parole.

10. The court did so upon the Department of Corrections' assertion that it had mistakenly included certain prisoners on the lists it had provided of those least deserving of further incarceration.

11. The day after the district court issued the writs, Alabama Attorney General Graddick, who had not previously been active in this litigation, moved to intervene and requested a stay. On July 17, the Governor, in his capacity as receiver, moved to dismiss the Attorney General's motions. The district court denied the motion to stay on July 22. On July 23, the Attorney General sought a stay in this court, which was denied. That same day the Attorney General filed for a stay in the Supreme Court. On July 25, Circuit Justice Powell denied the Attorney General's motion. The Attorney General then moved the Chief Justice

the overcrowded conditions of the county jails. Again, instead of seeking to have the State held in contempt and coercive sanctions imposed for its noncompliance with the October 9, 1980, consent decree, they moved for "enforcement" of that decree by asking the court to release more prisoners. The motion was heard on November 12. The parties stipulated that approximately 1,500 state prisoners remained in county jails, though the consent decree required that none be confined there beyond the previous September 1. On December 14, 1981, the court ordered the release of 352 named inmates on December 22. This order differed from the one issued on July 15 in three respects. First, the court did not issue writs of habeas corpus.[12] Second, the court placed the releasees on parole, subject to the parole authority of Alabama law. Third, the court ordered that all unreleased inmates who would be eligible for parole within six months of the date of its order be considered for parole immediately.

The State moved the district court to stay its December 14 order; the motion was denied. The State then applied to us for a stay, and we granted one pending this appeal. Both the district court's July 15 and December 14 orders are before us.[13]

fully complied with that order directing release of specifically named inmates and accelerating parole eligibility for others. The July order was not a continuing injunction; it merely required the State to perform certain discrete acts, which it did. No action by this court could change what has been done, and "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).

The court faced a similar scenario in *Southern Bell Tel. & Tel. Co. v. United States*, 541 F.2d 1151 (5th Cir. 1976), and determined that "the matter in controversy ha[d] become passe" because the defendants had "complied with all the orders of the District Court and all the orders [had] expired." *Id.* at 1154. It therefore dismissed the appeal as moot. We do likewise with the appeal of the district court's July 15 order.

The appeal of the December 14 order does not suffer the same fate, however. Having granted a stay of that order, we are faced with a live controversy and consider the December order on its merits.[14]

## II.

We first determine that the appeal of the district court's July 15 order should be dismissed as moot. The defendants have

## III.

Before discussing the propriety of the December 14 order, we must properly characterize it. All of the parties, and ap-

for a stay, and he referred the motion to the entire Court, which denied it on September 2. *Graddick v. Newman*, 453 U.S. 928, 102 S.Ct. 4, 69 L.Ed.2d 1025 (1981). In the meantime, on July 25, the 277 prisoners granted habeas writs were released.

12. See note 8, *supra*.

13. Only the Attorney General appealed the July 15 order; neither the other defendants nor the receiver opposed this first release of prisoners. While there is room to argue that the Attorney General was not a party to this litigation when he appealed the July order, see note 11, *supra*, we accept Justice Rehnquist's guidance that the Attorney General has always been a party to this case, although an inactive one, since his

predecessors as Attorneys General were made parties. *Graddick v. Newman*, 453 U.S. 928, 102 S.Ct. 4, 10, 69 L.Ed.2d 1025 (1981) (opinion of Justice Rehnquist). The Attorney General may therefore properly appeal the district court's July 15 order. All of the defendants and the receiver have appealed the district court's December 14 order.

14. That we review the December order on its merits buttresses our decision to dismiss the appeal of the July order as moot, for it demonstrates that the July decree did not present an issue "capable of repetition, yet evading review." *Preiser v. Newkirk*, 422 U.S. 395, 403, 95 S.Ct. 2330, 2335, 45 L.Ed.2d 272 (1975).

parently the district court, regarded that order as a means of "enforcing" the October 9, 1980, consent decree. This view was mistaken. The December 14 order was a distinct mandatory injunction in which the court framed relief that was beyond the contemplation of the consent decree: the immediate release of 352 state prisoners. We now explain how we arrive at this conclusion.

The consent decree directs the State to limit the state inmate population of county jails. How the State is to accomplish this is left to the State. If the State seeks to comply with the decree by freeing prisoners, it alone would determine who is to be released and the conditions of release. The plaintiffs, if they think the State is failing to take the action required by the consent decree and wish the court to intervene, have available a traditional equitable remedy. They can initiate contempt proceedings by moving the court to issue an order to show cause why the State should not be held in civil contempt. At the show cause hearing, the State would be entitled to demonstrate that it had complied with the court's decree, or why it should not be adjudged in contempt, or if adjudged in contempt, why sanctions should not be imposed. The State would also have the right to move the court to modify the consent decree.[15]

■ If the court finds that the State has failed to comply with the consent decree

and holds the State in contempt,[16] a variety of sanctions would be available to the court, depending on the circumstances. One sanction might be to incarcerate one or more of the defendants, or the receiver. While a federal court is always reluctant to coerce compliance with its decrees by incarcerating a state official, if that official is in contempt there can be no doubt of the court's authority to do so. *See Hutto v. Finney*, 437 U.S. 678, 690, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978). State officials are not above the law.

Another sanction might be to fine the recalcitrant officials. "Civil contempt may . . . be punished by a remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance. . . . If [a state official] refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." *Id.* at 691, 98 S.Ct. at 2573.

In this case the plaintiffs chose to ignore equity's time-honored contempt procedure in their effort to obtain the State's compliance with the October 9, 1980, decree. They did not seek the imposition of sanctions against the state officials who were charged with reducing the prisoner population in the county jails; instead, they asked the court itself to assume that responsibility and to effect the reduction. The plaintiffs simply moved the court to select the prisoners to be released and to release them. By

---

**15.** While the State could not attack the validity of the underlying consent decree at a show cause hearing, *AMF Inc. v. International Fiberglass Co.*, 469 F.2d 1063 (1st Cir. 1972), it would of course be free to move the court to *modify* that decree based on changed conditions. A motion to modify could be heard contemporaneously with the show cause order and could bear on the outcome of the contempt hearing.

**16.** At oral argument, counsel for the State suggested that an adjudication of contempt would never be appropriate in this case because the State's good faith efforts at compliance with the consent decree would preclude a finding of wilfulness which, according to the State, is a necessary element of civil contempt. The Su-

preme Court long ago disposed of this contention:

> The absence of wilfulness does not relieve from civil contempt. Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. . . . Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act.

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949) (citations omitted). *See Louisiana Education Assn. v. Richland Parish School Bd.*, 421 F.Supp. 973, 976 (W.D.La.1976) *aff'd* 585 F.2d 518 (5th Cir. 1978).

so moving, the plaintiffs sought new and extraordinary injunctive relief that was beyond the scope of the consent decree.

The court responded by ordering the Department of Corrections to identify several hundred prisoners who were, in the eyes of the Department, most worthy of release. The court then decided who among those identified should be released, ordered the release of 352 prisoners, and directed the Alabama Board of Pardons and Paroles to supervise the releasees as it would prisoners the Board paroled. None of this relief was provided in the consent decree, either expressly or by implication. Thus, in our view, the district court's order was a discrete mandatory injunction. The question thus becomes whether the district court had before it on December 14 the necessary predicate for a mandatory injunction and, if so, whether the court abused its discretion in fashioning the relief it did.

■ To be entitled to permanent injunctive relief from a constitutional violation, a plaintiff must first establish the fact of the violation. *Rizzo v. Goode*, 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976). He must then demonstrate the presence of two elements: continuing irreparable injury if the injunction does not issue, and the lack of an adequate remedy at law. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959). If the plaintiff makes such a showing, the court may grant injunctive relief, but the relief must be no broader than necessary to remedy the constitutional violation. *See Newman v. Alabama*, 559 F.2d 283, 288 (5th Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). We now test the district court's December 14 injunction against these requirements.

■ First, the plaintiffs more than adequately established a constitutional violation requiring redress. In *Newman v. Alabama*, 466 F.Supp. at 630, the district court

specifically found that the confinement of Alabama inmates in county jails violated the Constitution. That decision was not appealed. Moreover, the October 9, 1980, consent order, which, of course, is binding on the State, recognized the unconstitutional overcrowding in the county jails by specifying measures to alleviate it. Also significant is that the State never moved the district court to modify its findings concerning overcrowding; thus, as the case came before the district court on December 14, 1981, the fact of unconstitutional overcrowding of state prisoners in county jails could not be disputed.

■ We conclude, however, that the plaintiffs did not carry their burden of showing the inadequacy of their legal remedy.[17] For the plaintiffs had a complete legal remedy had they only availed themselves of it. The October 9, 1980, consent decree, which set limits on state inmate population in county jails, represented effective relief for the established constitutional violation. Certainly, the plaintiffs must concede that if the State had complied fully with the consent decree, the unconstitutional overcrowding in the county jails would have been remedied. And, as we have earlier recounted, the law provided the plaintiffs a procedure for obtaining full compliance with that decree in the event the State refused to abide by its terms: a civil contempt proceeding and coercive sanctions. Thus, the plaintiffs possessed all the legal relief they could have expected: a consent decree containing a remedy for the constitutional violation and the means for realizing that remedy.

When the plaintiffs sought the injunctive relief the district court gave them on December 14, they made no showing that the State, if adjudged in contempt for violating the consent decree, would not respond to any of the traditional sanctions available to the court to coerce compliance; the court was therefore not presented with a situa-

---

**17.** In this context, the issues of inadequate legal remedy and irreparable injury are closely related; we thus do not address the irreparable injury element separately.

tion in which its contempt power might be ineffectual.[18] The plaintiffs plainly were not entitled to a completely new injunction whose issuance depended on a demonstration of inadequate legal remedy, and the district court erred in granting it.

■ Even if the plaintiffs had established the proper predicate for an injunction, the December 14 order would nevertheless fall since it involved the court in the operation of the State's system of criminal justice to a greater extent than necessary to remedy the constitutional violation. A federal court, when fashioning a remedy to redress constitutional violations in a prison, must recognize that it is ill-equipped to involve itself intimately in the administration of the prison system. *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Deference to prison authorities is especially appropriate when state penal facilities are involved. *Id.*, 94 S.Ct. at 1807.

■ The district court's December 14 injunction is defective in several respects. First, in determining which prisoners to release, the court utilized its previously ordered lists of inmates that the Department of Corrections believed to be "least deserving of further incarceration." Under Alabama law, however, the Board of Pardons and Paroles, and not the Department of Corrections, determines inmate release eligibility, as well as all other parole policy. In ordering the Department of Corrections to determine which prisoners the court should consider for release, the district court overrode the division of authority between the Department of Corrections and the Board of Pardons and Paroles, and intruded upon Alabama parole policy.[19] Moreover, by actually naming the prisoners to be released and ordering that their release be subject to Alabama parole authority, the court further usurped the functions of Alabama prison and parole officials, who were reduced to mere functionaries in carrying out the court's commands.

Finally, the court's overreaching, in directing the Board of Pardons and Paroles to supervise the releasees as if they had been paroled under Alabama law and in ordering the Board to accelerate the parole eligibility of unreleased prisoners, becomes even more apparent when we consider that the Board of Pardons and Paroles was not, and is not, a party in this case.

Of course, our conclusion that the provisions of the district court's December injunction were overly broad is only correct if the court could have taken other, less intrusive, action. We find that it could have. We are again drawn to the October 9, 1980, consent decree which sets limits on state inmate population in county jails. This consent order gives the plaintiffs complete relief without unnecessarily entangling the district court in the administration of the prison and parole systems; it charges the lawfully constituted Alabama state officials with conforming the jail population to the decreed limits. That this is the proper course cannot be questioned:

[A] district court in exercising its remedial powers may order a prison's population reduced in order to alleviate unconstitutional conditions, but the details of in-

---

**18.** It could be argued that a conclusion that the court's contempt power is ineffectual cannot be drawn until the court first exercises that power and sanctions fail to produce compliance with the underlying injunctive order.

**19.** Alabama law of parole provides that:

No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the *board of pardons and paroles* is of the opinion that there is reason-

able probability that, if such prisoner is released, he will live and remain at liberty without violating the law and that his release is not incompatible with the welfare of society. ALA.CODE tit. 15–22–26 (1975) (emphasis supplied). By ordering the Department of Corrections to submit names of prisoners whom *it believed* worthy of release, the district court directly contradicted Alabama law, which vests all parole authority and discretion in the Board of Pardons and Paroles.

mate population reduction should largely be left to prison administrators. This is consistent with the policy of minimum intrusion into the affairs of state prison administration that the Supreme Court has articulated for the federal courts. *See Williams v. Edwards*, 547 F.2d 1206, 1212 (5th Cir. 1977).

*Ruiz v. Estelle*, 650 F.2d 555, 570–71 (5th Cir. 1981).

The consent decree appears to represent the proper balance between the duty of the district court to remedy constitutional violations and the right of the State to administer its prison and parole systems. More importantly, it places the *responsibility* for operating a constitutional prison system where it belongs: with the State. It is the State that must, and should, make the tough, even agonizing, decisions how to meet the terms of the consent decree. In ordering the release of state inmates, the district court, in effect, relieved the State of its responsibility to follow the law, while at the same time involving itself impermissibly in the operation of the Alabama prison and parole systems.

Our reasoning is informed and supported by the analysis the former Fifth Circuit employed when it reviewed this case in 1977. In *Newman v. Alabama*, 559 F.2d at 288, the court determined that the

> real issue is whether in striving to attain constitutional objectives the District Court in a few respects went impermissibly beyond the requirements of the federal constitution; more specifically, did the Court supersede the duly constituted state authorities in the performance of vital state functions rather than *compelling* those authorities to perform those functions in a constitutional manner? We all understand, of course, that federal courts have no authority to address state officials out of office or to fire state employees or to take over the performance of their functions. Most assuredly, however, in proper cases a federal court can, and must, compel state officials or employees to perform their official duties in compliance with the Constitution of the United States.

What was true then remains so now.

In summary, the district court erred in entering the December 14 injunction since the plaintiffs possessed an adequate legal remedy in the form of the October 9, 1980, consent order which was enforceable through the court's contempt power. Even if the issuance of an injunction had been warranted on December 14, the district court abused its discretion by framing relief which was impermissibly intrusive on the State's prerogative to administer its prison and parole systems.

### IV.

For the reasons stated, we DISMISS the appeal of the district court's July 15, 1981, order as MOOT. The December 14, 1981, order of the district court is VACATED and this cause is REMANDED for proceedings not inconsistent with this opinion.

SO ORDERED.